**EDUCATIONAL EMPLOYEES CREDIT UNION, a Missouri Credit Union, Plaintiff–Appellee,**

v.

**MUTUAL GUARANTY CORPORATION, a Tennessee Corporation, Defendant–Appellant.**

No. 94–2139.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 16, 1994.

Decided April 3, 1995.

Terrence Joseph Good, St. Louis, MO, argued (John Fox Arnold and Carolyn M. Kopsky, on the brief), for appellant.

Peter T. Sadowski, St. Louis, MO, argued (Henry F. Luepke, on the brief), for appellee.

Before McMILLIAN, Circuit Judge, BRIGHT and REAVLEY,* Senior Circuit Judges.

* The HONORABLE THOMAS M. REAVLEY, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

BRIGHT, Senior Circuit Judge.

Mutual Guaranty Corporation (Tennessee Guaranty), a Tennessee mutual share guaranty association, appeals the district court's granting of summary judgment in favor of Educational Employees Credit Union (Missouri Credit Union), a Missouri credit union. Tennessee Guaranty agreed to provide Missouri Credit Union with basic share insurance, and, as a condition for its insurance, required Missouri Credit Union to deposit with Tennessee Guaranty a capital contribution and a special assessment, totaling $2,045,717.98, which the district court ordered returned to Missouri Credit Union.

The controversy in this case focuses on whether Tennessee Guaranty or Missouri Credit Union is entitled to the capital contribution and special assessment still held by Tennessee Guaranty. Relying on a Missouri statute, Mo.Rev.Stat. § 370.362, which, among other things, requires insurers, such as Tennessee Guaranty, to refund to Missouri credit unions their capital contributions and special assessments, Missouri Credit Union brought suit seeking a refund of its capital contribution and special assessment. Tennessee Guaranty resisted recovery claiming that the Missouri statute was not enforceable over these funds but that Tennessee law controlled and provided for Tennessee Guaranty to retain the funds. Alternatively, Tennessee Guaranty contended that if Missouri law applies, Missouri law cannot deprive Tennessee Guaranty of all or part of the deposited fund by reason of the Contract Clauses of the Missouri and the United States Constitutions.

The district court granted summary judgment in favor of Missouri Credit Union requiring Tennessee Guaranty to return Missouri Credit Union's capital contribution and special assessment. On appeal, Tennessee Guaranty reasserted its claims that the district court erred in applying Missouri law, rather than Tennessee law, to the controversy, and that provisions of the Contract Clauses of the Missouri and the United States Constitutions bar the enforcement of the Missouri statute as applicable to this case.

For the reasons discussed below, we reverse the district court's granting of summary judgment in favor of Missouri Credit Union and remand for further proceedings to determine whether a Contract Clause violation exists.

## I. BACKGROUND

We revisit the facts as set forth in the district court's opinion, reported at *Educational Employees Credit Union v. Mutual Guaranty Corporation*, 821 F.Supp. 1294 (E.D.Mo.1993). Tennessee Guaranty is a mutual share guaranty association created by special statutory authority under Tennessee law. Tennessee Guaranty's membership consists entirely of foreign and domestic credit unions. Its primary purpose is to guarantee the accounts of individual account holders of member credit unions.

On June 1, 1978, Tennessee Guaranty was authorized to insure Missouri credit unions, as evidenced by an agreement among the State Credit Union Share Insurance Corporation,[1] the Commissioner of the Department of Banking of the State of Tennessee, the Director of the Division of Insurance of the State of Missouri, and the Director of the Division of Credit Unions of the State of Missouri. The 1978 Agreement recognizes that, for a temporary period of time, Tennessee Guaranty would be considered as conducting the business of insurance in Missouri and that it would be subject to the provisions of Missouri's insurance laws. Tennessee Guaranty, however, would become subject to the exclusive jurisdiction, supervision, regulation, and examination of the Director of the Division of Credit Unions for the State of Missouri upon the effective date of the enactment of an amended Mo.Rev.Stat. § 370.375. In 1982, Missouri enacted § 370.375, providing that corporations, such as Tennessee Guaranty, would in fact be subject to the exclusive jurisdiction, supervision, regulation, and examination of the Director of the Divi-

---

1. Tennessee Guaranty is the successor in interest to the State Credit Union Share Insurance Cor-  poration.

sion of Credit Unions for the State of Missouri.

In October 1984, Missouri Credit Union entered into an insurance contract with Tennessee Guaranty, which contained a "choice-of-law" provision stipulating that the contract would be subject to Tennessee law. Missouri Credit Union agreed to:

comply with the bylaws of the Corporation [Tennessee Guaranty], as from time to time amended. The Credit Union [Missouri Credit Union] further agree[d] that this contract may be amended by an amendment to the bylaws of the Corporation, provided the Corporation shall mail written notice of such amendment to the Credit Union at least ten (10) days prior to the effective date of such amendment.

As a credit union member, Missouri Credit Union was required to make and maintain during its membership period a capital contribution equal to 1% of the shares of its account holders. Missouri Credit Union was also subject to the payment of any special assessment. During the relevant time period, the by-laws in effect provided that the aggregate of the capital contributions and any special assessment paid by a member credit union constitute the equity interest of the member in Tennessee Guaranty and shall be considered as a part of the assets of the member. Upon joining Tennessee Guaranty, Missouri Credit Union deposited with Tennessee Guaranty $1,486,558.17 as its capital contribution.

At the time that Missouri Credit Union became a member of Tennessee Guaranty, Tennessee Guaranty's by-laws provided that upon withdrawal of a member credit union:

[t]he member credit union shall be entitled to a return of paid-in capital contributions. Provided, however, the Board of Directors of the Corporation, in the exercise of its sole discretion, may assess a penalty ("withdrawal penalty") against the withdrawing member credit union in an amount not to exceed thirty (30%) percent of the withdrawing member credit union's paid-in and due capital contributions and special assessments.

By–Laws, Article IV, § 6(g)(2)(aa).

On October 1, 1986, Tennessee Guaranty's Board of Directors voted unanimously to amend the by-laws by materially changing the withdrawal provision. Instead of allowing any return of capital and special assessment funds to a withdrawing credit union member, the amended by-laws now provided that Tennessee Guaranty would retain the funds in total. In addition, the Board of Directors unanimously adopted a resolution which levied a special assessment to its capital fund in the amount of one-half of one percent of the shares, accounts, and certificates of its member credit unions. On October 2, 1987, Tennessee Guaranty mailed notice of the amendment to all credit union members. On December 1, 1987, after the effective date of the by-law amendment, Missouri Credit Union paid Tennessee Guaranty an additional $559,159.81 as a special assessment, bringing the total amount of money deposited by Missouri Credit Union with Tennessee Guaranty to $2,045,717.98.

On March 7, 1991, the Missouri legislature enacted Mo.Rev.Stat. § 370.362, repealing §§ 370.370 to 370.382 which pertained to credit union share guaranty corporations. The Missouri legislature declared that its enactment of the new credit union statute was an "emergency act within the meaning of the constitution." 1991 Mo.Laws 875. In the Emergency Clause, the Missouri legislature states:

Because of the need to insure that credit unions in this state remain solid and financially strong and that the assets of citizens of this state remain safe and secure, this act is deemed necessary for the immediate preservation of the public health, wealth, peace and safety, and is hereby declared to be an emergency act within the meaning of the constitution, and this act shall be in full force and effect upon its passage and approval.

1991 Mo.Laws 875.

Section 370.362(1) of Missouri's new credit union statute requires that Missouri credit unions must be insured by the National Credit Union Share Insurance Fund (NCU-

SIF), a federal insurer, in order to remain in operation. Specifically, the section mandates that all credit unions, not currently insured by the NCUSIF, apply for basic share insurance coverage with NCUSIF within ninety days of the effective date of the section, March 7, 1991. Sections 370.362(1) and (2) require a credit union to obtain a certificate of insurance from NCUSIF within twenty-four months of March 7, 1991.

Missouri's new credit union statute also requires non-federal share insurers, no longer insuring credit union risks in Missouri, to return to those credit unions that converted to NCUSIF all paid-in capital contributions and special assessments. Section 370.362(6) provides:

> When a credit union that has been insured by a nonfederal insurer, converts its share insurance to [NCUSIF] the nonfederal insurer shall immediately return to such credit union the amount of unearned premiums, paid-in capital contributions and special assessments that the credit union has paid to such nonfederal insurer, unless the credit unions, which are members of such nonfederal insurer subsequent to March 7, 1991, agree otherwise.

Mo.Rev.Stat. § 370.362(6).

Finally, section 370.362(7) provides that "[n]o bylaw amendment of any nonfederal insurer shall be binding upon any Missouri credit union unless and until approved by the Missouri division of credit unions." Tennessee, however, has no statute specifically addressing the return of capital contributions or special assessments upon the withdrawal of a credit union member.

Subsequent to the enactment of Mo.Rev. Stat. § 370.362, Missouri Credit Union withdrew as a member of Tennessee Guaranty and, citing Mo.Rev.Stat. § 370.362(6), sought to require Tennessee Guaranty to pay to Missouri Credit Union the amount of the capital contribution and the special assessment paid to Tennessee Guaranty. In accordance with Tennessee law, the terms of its by-laws, and the parties' contract, Tennessee Guaranty refused to pay the funds.

In 1992, Missouri Credit Union filed this action in Missouri state court against Ten-

nessee Guaranty in six counts for the return of its capital contribution and special assessment. Missouri Credit Union sought recovery of its money under theories of money had and received, unjust enrichment, breach of contract, conversion, rescission, and relief against forfeiture. Tennessee Guaranty subsequently removed the action to federal court.

Missouri Credit Union moved for summary judgment asserting that Missouri's credit union statute is constitutional and applicable to Tennessee Guaranty requiring return of the funds in question. It further asserted under Missouri's credit union statute that Tennessee Guaranty can no longer provide Missouri Credit Union with insurance. Tennessee Guaranty moved for summary judgment too, arguing that Tennessee law, not Missouri law, governs the parties' contractual rights and obligations and contending that the choice-of-law provision in the contract does not interfere with any fundamental policy of Missouri. In addition, Tennessee Guaranty asserted that the application of the Missouri credit union statute would substantially impair and interfere with the parties' established contractual rights and duties, thus violating the Contract Clauses of the Missouri and United States Constitutions. The district court granted summary judgment in favor of Missouri Credit Union, determining that Missouri's credit union statute was constitutional and applicable to Tennessee Guaranty. Tennessee Guaranty now appeals.

## II. DISCUSSION

We review the district court's granting of summary judgment de novo and apply the same standards as did the district court. *Egan v. Wells Fargo Alarm Serv.*, 23 F.3d 1444, 1446 (8th Cir.1994).

The principal question presented by this appeal is whether Tennessee Guaranty is required to return Missouri Credit Union's capital contribution and special assessment as mandated by Mo.Rev.Stat. § 370.362, even though neither the terms of their insurance contract nor Tennessee law, which governs this insurance contract, requires Tennessee Guaranty to do so.

■ Tennessee Guaranty argues that the district court erred in determining that Missouri law, as opposed to Tennessee law, controls the parties' contractual rights and obligations. Tennessee Guaranty claims that the choice-of-law clause in the insurance contract, stating that Tennessee law governs, must be honored in order to protect the expectations of the parties. We disagree.

■ Federal district courts apply the choice-of-law rules of the state in which they sit when jurisdiction is based on diversity of citizenship. *Electrical & Magneto Service Co. (EMS) v. AMBAC Int'l Corp.*, 941 F.2d 660, 661 (8th Cir.1991) (quoting *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir.1991)). On appeal, we review the district court's application of the state's choice-of-law rule de novo. *EMS*, 941 F.2d at 661.

We agree with the district court's determination that Missouri courts rely on the Restatement (Second) of Conflicts in contract actions, and the district court's conclusion that Tennessee Guaranty is subject to Missouri's credit union laws. The district court, relying on *EMS*, concluded that Missouri bypasses the Restatement's formal analysis and simply requires that the choice-of-law provision be given effect unless to do so would violate a fundamental policy of Missouri. "The Restatement must be applied in the same manner as it would be applied by Missouri courts; to the extent that Missouri bypasses the Restatement's formal analysis, so must federal district courts sitting in Missouri." *Id.* at 662.

In applying the *EMS* standard, Missouri courts would not honor the choice-of-law provision in the parties' contract because applying Tennessee law would conflict with a fundamental policy against the forfeiture of credit union capital contributions and special assessments. *State ex rel. Geil v. Corcoran*, 623 S.W.2d 555, 556 (Mo.Ct.App.1981). As the district court aptly noted, section 370.362 promotes Missouri's fundamental policy to further the continued financial security of Missouri's credit unions by requiring that the credit unions be insured by a federal insurer

and requiring non-federal insurers, who are licensed to conduct business in Missouri, to return capital contributions and special assessments upon a credit union's withdrawal from membership. The district court pointed out that the funds held by the non-federal insurers are large sums of money, the forfeiture of which could adversely affect a Missouri credit union's stability if retained by the non-federal insurer, considering the fact that the withdrawing credit union is forced to make a large cash outlay for insurance with the NCUSIF.

Under the Restatement (Second) Conflict of Laws, § 187, Missouri's fundamental policy could not be disregarded unless (1) Missouri's interest in preventing the forfeiture of credit union assets does not outweigh Tennessee's interest in promoting forfeiture, or (2) the parties could have agreed, by an express provision in the insurance contract, that they would be exempt from Missouri credit union laws. The district court went on to correctly conclude that Missouri had a greater interest than Tennessee in the outcome of the litigation because a Missouri statute specifically addressed the issue, whereas Tennessee's statutory and case law is silent on the issue.

The parties had agreed, and expected, that they would comply with Missouri law. First, Tennessee law, the law under which the insurance contract was created, requires the parties' insurance contract to be lawful under Missouri law. Second, in the 1978 Agreement that Tennessee Guaranty entered into with various Missouri officials, Tennessee Guaranty agreed to be subject to Missouri's credit union laws.

■ Although we agree with the district court's determination that Missouri law applies, it is circumscribed by the Contract Clause of the United States Constitution. Tennessee Guaranty argues that § 370.362 impairs the obligations of the insurance contract between it and Missouri Credit Union in violation of the Contract Clauses of the Missouri [2] and the United States Constitutions.

**2.** Under Missouri law, the determination of whether a statute violates the Contract Clause is similar under both the Missouri and United States Constitutions. *See Missouri Dental Board*

■ The Contract Clause of the United States Constitution provides: "No State shall ... pass any Law impairing the Obligations of Contracts." U.S. CONST. art. I, § 10. In determining whether a Contract Clause violation exists, the threshold inquiry is whether the statute substantially impairs a contractual relationship. *Energy Reserves Group v. Kansas Power and Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983). In this case, there is no question that the Missouri credit union statute substantially impairs a contractual relationship between Tennessee Guaranty and Missouri Credit Union. As the district court properly concluded, § 370.362(6) does substantially impair the insurance contract between the parties because it materially alters Tennessee Guaranty's duties with respect to Missouri Credit Union's capital contribution and special assessment.

■ If state law does substantially impair a contractual obligation, then the second inquiry is whether the state had a "significant and legitimate public purpose behind the regulation." *Id.* A significant and legitimate public purpose behind the regulation may be a broad general, social, or economic problem. *Burlington Northern Railroad v. State of Nebraska*, 802 F.2d 994, 1006 (8th Cir.1986). "The public purpose need not be addressed to an emergency or temporary situation, as long as the state enacts a generally applicable rule designed to advance the societal interest." *Id.* The final determination is whether the adjustment of the rights of the contracting parties is based on " 'reasonable conditions which justified adoption of the legislation' " and is of a character appropriate to the public purpose. *Id.* (citing *Energy Reserves Group,* 459 U.S. at 412, 103 S.Ct. at 704.)

Applying this standard to the record before this court, we conclude that the district court erred by determining that Mo.Rev.Stat. § 370.362(6), as a matter of law, does not violate the Contract Clause of the United States Constitution. The district court determined that Missouri had a significant and legitimate public purpose in enacting the credit union statute, specifically as a proper exercise of the inherent police power of the state and to protect the economic interest of the citizens of Missouri.

In making that determination, the district court failed to take into account the interests of all parties insured by Tennessee Guaranty. While § 370.362(6) purports to protect the interests of the depositors in Missouri, in analyzing the entire public purpose, the court must consider the interests of other credit union members, both foreign and domestic, who have capital contributions and special assessments deposited with a mutual share guaranty association. To withdraw all of Missouri Credit Union's capital contribution could lead to losses of other insureds.

■ The Contract Clause imposes some limits upon the power of a state to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power. *Allied Structural Steel v. Spannaus,* 438 U.S. 234, 242, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978). In *Allied,* a private employer challenged the constitutionality of Minnesota's Private Pension Benefits Protection Act which subjected the employer to a "pension funding charge" if the employer terminated a pension plan or closed a Minnesota office. The Court held the Minnesota statute invalid under the Contract Clause.

The Court noted that the Minnesota law not only retroactively modified the employer's obligations, it did so in an area where the element of reliance was vital—the funding of a pension plan. *Id.* at 246, 98 S.Ct. at 2723. The Court went on to state that:

"These [pension] plans, like other forms of insurance, depend on the accumulation of large sums to cover contingencies. The amounts set aside are determined by a painstaking assessment of the insurer's likely liability. Risks that the insurer foresees will be included in the calculation of liability, and the rates or contributions charged will reflect that calculation. The occurrence of major unforeseen contingencies, however, jeopardizes the insurer's solvency and ultimately, the insureds' benefits. Drastic changes in the legal rules

*v. Alexander,* 628 S.W.2d 646, 652 (Mo.1982) (en banc).

governing pension and insurance funds, like other unforeseen events can have this effect."

*Id.* at 246–47, 98 S.Ct. at 2723 (quoting *Los Angeles Dept. of Water & Power v. Manhart,* 435 U.S. 702, 721, 98 S.Ct. 1370, 1382, 55 L.Ed.2d 657 (1978)).

In *Allied,* the employer arranged for a pension fund to protect its employees and the State of Minnesota intervened to change that relationship. The Minnesota law altered the relationship between the parties to give more to the employees than the employer had agreed, an example of robbing from Peter and paying Paul.[3]

Following this rationale and relying on *Energy Reserves Group,* 459 U.S. at 416, 103 S.Ct. at 707, we recently determined that a Contract Clause violation existed in a Minnesota statute that directed excess premiums in a reinsurance fund to be paid to employers rather than insurers under an existing agreement. *In re: Workers' Compensation Refund,* 46 F.3d 813, 821 (8th Cir.1995). This precedent supports our ruling that a Contract Clause violation may exist in the case under submission.

Similarly, a mutual share guaranty association is an insurer of credit unions, benefiting the credit unions' depositors. Credit union members from Missouri, Tennessee, and other states have paid funds to Tennessee Guaranty with the belief that these pooled funds would be available in case of financial difficulty. Losses experienced by member credit unions can and do deplete the pool of funds. If capital contributions are necessary to pay losses, other credit unions will suffer greater

losses than if the pool remains as is. If Tennessee Guaranty were to liquidate or dissolve, then there may be insufficient funds for the member credit unions to receive a return of the total amount paid by them as capital contributions, including special assessments.[4]

The Missouri credit union statute may impair the interests of other credit union members by forcing the return of all the assets of one credit union member, thereby prejudicing another credit union member, in effect, robbing Peter and paying Paul. Additionally, in determining whether the adjustment of the rights of the contracting parties is based on reasonable conditions which justified the adoption of the legislation, the district court merely assumed that because the savings and loan was traditionally subject to regulation, the Missouri credit union statute is a proper exercise of Missouri's police power.

If what Tennessee Guaranty contends is true, that other similarly situated credit union members will be deprived of pro rata protection of basic share insurance, then the Missouri credit union statute may violate the Contract Clause. Under the rationale of *Allied,* the district court must address this problem to determine, on a factual basis, whether there was an interference with the rights of other credit unions which would violate the Contract Clause of the United States Constitution.[5]

The district court must first determine whether, under Missouri law, Tennessee Guaranty's relinquishment of Missouri Credit Union's capital contribution and special as-

---

**3.** The expression "to rob Peter and pay Paul" is believed to have its origin in the reign of Edward VI when the lands of St. Peter at Westminster were appropriated to raise money for the repair of St. Paul's in London. John Bartlett, Familiar Quotations, at 160 & n. 2 (15th ed. 1980).

**4.** Although Missouri Credit Union states in its brief that Tennessee Guaranty intends to pay all credit union members pro rata, this information is not part of the record in this appeal.

**5.** The district court, relying on *In re Walker,* 959 F.2d 894 (10th Cir.1992), concluded that the court is not in a position to second guess the Missouri legislature as to the necessity of the Missouri credit union statute in order to main-

tain economic stability of Missouri credit unions and to provide financial security for the citizens of Missouri. In *Walker,* the Tenth Circuit addressed the issue of whether a debtor's annuities are subject to exemption from the bankrupt's estate pursuant to the relevant Oklahoma exemption statutes. *Walker* is distinguishable from the case at hand because the state law in question did not alter any contractual relations between parties. Additionally, a creditor does not have an absolute right to any particular assets of the bankruptcy estate. In essence, *Walker* is inapposite to the case at hand because the Oklahoma statute did not alter and impair the rights and obligations of parties to a contract as Minnesota law did in *Allied.*

**1440**

sessment, which comprises a portion of the insurance fund, will deprive the other credit union members of Tennessee Guaranty of pro rata protection of the existing insurance fund. This determination can only be made after a hearing before the district court, with the burden on Tennessee Guaranty to show a violation of the Contract Clause which will prejudice other credit unions by depriving them of a portion of their capital contributions, including assessments to offset losses or potential losses. If this calculation shows that other members will be prejudiced to an equal share of this fund compared to Missouri Credit Union, then the Contract Clause of the United States Constitution is violated. Missouri's credit unions are entitled to only the same allocable portion of the capital contributions as other credit unions, if Tennessee Guaranty were liquidated at this time.

### III. CONCLUSION

Accordingly, we reverse the district court's granting of summary judgment in favor of Missouri Credit Union. We remand this case for findings on whether all of the credit union members would receive all of their capital contributions and special assessments if Tennessee Guaranty were liquidated at this time. Otherwise Missouri Credit Union is entitled to its pro rata share of the capital contributions (including special assessments) held as a reserve for losses.

McMILLIAN, Circuit Judge, concurring separately.

I concur in the results only.